**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**ROCK ISLAND DIVISION**

| | |
|---|---|
| VALERIE ESSEBO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:08-cv-04055 |
| ) | |
| TYSON FOODS, INC., ) | |
| ) | |
| Defendant. ) | |
| ) | |

## ORDER

This matter is now before the Court on Defendant, Tyson Foods' ("Tyson"), Motion for Summary Judgment. For the reasons set forth below, Tyson's Motion for Summary Judgment [#12] is GRANTED.

## PROCEDURAL HISTORY

On April 7, 2008, Plaintiff, Valerie Essebo ("Essebo"), filed a cause of action alleging retaliatory discharge in the Circuit Court of the Fourteenth Judicial Circuit, Rock Island County. On October 3, 2008, Tyson filed a Notice of Removal to federal court pursuant to 28 U.S.C. § 1332. In its Notice of Removal, Tyson alleged that Tyson and Essebo are citizens of different states, and the alleged amount in controversy exceeds $75,000. Essebo did not object to this removal.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Essebo is a resident of Illinois; the defendant, Tyson, is a Delaware corporation, with its principle place of business in Arkansas, and the alleged amount in controversy exceeds $75,000.

**FACTUAL BACKGROUND**

When viewed in a light most favorable to Essebo, all evidence and reasonable inferences demonstrate the following relevant facts:

Plaintiff, Essebo, a non-english speaker (French and Ofon), was hired by Tyson in August, 2004. At all times relevant to her employment, Essebo was a member of the United Food and Commercial Workers Union ("Union"). As such, she paid Union dues, and she knew of her company's Union representative. As of October, 2004, Essebo was assigned the job of Feather Bone Buster at Tyson's Joslin Plant. This position required Essebo to use a machine to crack bones from cow carcasses as they came by on a chain.

On October 11, 2004, Essebo was injured at work when a cable attached to the machine she used for cracking carcass bones broke, causing the machine to fall on Essebo's thigh, knocking her to the ground. Tyson filed a Workers' Compensation claim for the accident on the day of her injury. As a result, Essebo received Workers' Compensation benefits from December 2, 2004, through April 29, 2007, when Tyson discontinued Essebo's disability benefits asserting its belief that Essebo had "reached her maximum medical improvement." (Def's Reply in Support of its Motion for Summary Judgment, p. 5). Currently, there is a case pending on this matter with the Illinois Workers' Compensation Commission.

On the night of the accident, Essebo went to Genesis Health Systems ("Genesis") for emergency medical treatment. On October 14, 2004, Essebo sought the treatment of Dr. Lund ("Lund"). Lund placed Essebo on work restrictions, and Tyson accommodated the restrictions by giving Essebo a light-duty job. Essebo returned to Lund on two

occasions prior to December 1, 2004, and she remained on work restrictions throughout this time. On December 1, 2004, Lund released Essebo from work restrictions, over her protests.

On December 2, 2004, Essebo sought a second opinion from Dr. Burge ("Burge"), a chiropractor. Burge gave Essebo a note excusing her from all work for two weeks. After taking Burge's note to the personnel manager, Tyson released her from work, in accordance with Burge's orders. Tyson states that on December 13, 2004, it sent Essebo a letter, in English, explaining that she was being placed on leave of absence, effective December 2, 2004, through December 2, 2005. The letter further informed Essebo that she could return anytime to her position as a Feather Bone Buster, or alternatively, she could "utilize the job bidding system...to sign, win and secure a different job" she could better physically tolerate.[1] On December 15, 2004, Essebo provided Tyson with another note from Burge, explaining that she must remain off work until she consulted a neurosurgeon regarding her injuries.

Subsequent to Essebo's consultations with both Lund and Burge, she saw Dr. Udehn ("Udehn"). Udehn excused Essebo from work until after she had surgery to correct her injury. After surgery, Udehn continued to excuse Essebo from work. In response to the work-release slips, Mitchell Reyhons, Tyson's regional case manager, sent Udehn a letter, with a copy sent to Essebo, explaining that Tyson would accommodate any work restrictions except for bed rest. Essebo testified in her

---

[1] In her Response to the Defendant's Motion for Summary Judgment, Essebo denies Tyson sent her such a letter. However, Essebo failed to support her denial with evidentiary support referenced by specific page. While the Court may doubt Essebo's denial, it is inconsequential because Essebo never attempted to return to work.

deposition testimony that Udehn never released her to work light-duty. Essebo further testified that, after additional consults with Dr. Goetsch, from Milan Medical Group ("Milan"), neither Dr. Goetsch, nor an physical therapist from Milan ever released her to work. She further testified that no doctor from whom she sought treatment ever released her to work either light-duty, or her full-duty job of Feather Bone Buster. Consequently, Essebo never contacted Tyson or the Union to let them know that she was able to return to any type of work. Her deposition testimony confirmed that she does not believe she is capable of performing any job, anywhere.

Tyson stated that on November 30, 2005, two days prior to the expiration of Essebo's one year leave of absence, it sent a letter to Essebo informing her that employment forfeiture would result if she failed to return to work within the remainder of her leave of absence, pursuant to Tyson's policy. Essebo denies receiving such a letter. In any event, Essebo did not return to Tyson prior to the expiration of her authorized leave of absence.

After Tyson terminated her, Essebo filed the present retaliatory discharge action against Tyson, claiming that she was terminated due to an Illinois Workers' Compensation Claim being filed on October 11, 2004. Tyson counters by arguing that it terminated Essebo when she failed to return to work after a one year leave of absence. Tyson states that it has terminated at least eleven (11) individuals at the Joslin plant for exceeding the one year leave of absence pursuant to its Leave of Absence policy.

## LEGAL STANDARD

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any,

show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case."  <u>Id.</u> at 325.  Any doubt as to the existence of a genuine issue for trial is resolved against the moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986); <u>Cain v. Lane</u>, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).  Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial.  <u>Celotex</u>, 477 U.S. at 324.  Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]."  <u>Holland v. Jefferson Nat. Life Ins. Co.</u>, 883 F.2d 1307, 1312 (7th Cir. 1989).  Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Hedberg v. Indiana Bell Tel. Co.</u>, 47 F.3d 928, 931 (7th Cir. 1995).

**DISCUSSION**

Illinois law forbids an employer to retaliate against an employee for filing a Workers' Compensation Claim.  To sustain a workers' compensation retaliatory

discharge claim under Illinois law, a plaintiff must prove that she was the defendant's employee before her injury; that she exercised a right granted by the Workers' Compensation Act; and that she was discharged from her employment with a causal connection to filing a workers' compensation claim. Tullis v. Townley Engineering & Mfg. Co., Inc., 243 F.3d 1058, 1062 (7th Cir. 2001). While Tyson concedes the first two elements, it argues that Essebo fails to establish a causal connection between her filing the Illinois Workers' Compensation claim and her termination. "The onus is on the employee to show affirmatively that her termination was motivated by unlawful intent to retaliate against her for exercising her statutory right." Feldman v. American Mem'l Life Ins. Co., 196 F.3d 783, 792 (7th Cir. 1999). "The element of causation is not met if the employer has a valid basis, which is not pretextual, for discharging the employee." Hartlein v. Illinois Power Co., 151 Ill.2d 142, 160 (1992).

To survive a motion for summary judgment in a retaliatory discharge claim, the plaintiff may proceed under the direct method by presenting direct or circumstantial evidence of retaliation. See Rogers v. City of Chicago, 320 F.3d 748, 753-754 (7th Cir. 2003). In the alternative, absent direct or circumstantial evidence, the plaintiff may use the indirect method to establish a prima facie case under the burden-shifting framework identified in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

A.   Direct Method

The direct method of proof requires the plaintiff use either direct or circumstantial evidence to demonstrate: that she was the defendant's employee; that she exercised a right granted by the Worker's Compensation Act; and that she was discharged from her

6

employment because she filed a worker's compensation claim.  Tullis v. Townley Engineering & Mfg. Co., Inc., 243 F.3d 1058, 1062 (7th Cir. 2001).  To satisfy the third element under the direct method, the plaintiff must prove by a preponderance of the evidence, that any reason supporting the defendant's decision to terminate the employee was pretextual in nature.  See McCoy v. Maytag Corp. 495 F.3d 515, 522 (7th Cir. 2007).

Direct evidence is "evidence that, if believed by the trier of fact, would prove the fact in question 'without reliance on inference or presumption.'" Rogers v. City of Chicago, 320 F.3d 748, 753 (7th Cir. 2003) (quoting Miller v. Borden, Inc., 168 F.3d 308, 312 (7th Cir. 1999)).  This "essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." Rogers, 320 F.3d at 753 (quoting Radue v. Kimberly-Clark Corp., 219 F.3d 612, 616 (7th Cir. 2000)).  In the present case, the record does not indicate that any representative of Tyson admitted a retaliatory reason for terminating the plaintiff, nor does Essebo argue that any employee of Tyson admitted a retaliatory reason for terminating her.

Alternatively, when there is an absence of direct evidence, the plaintiff may proceed under the direct method by providing circumstantial evidence.  Rogers, 320 F.3d at 753 (citing Gorence v. Eagle Food Ctrs., Inc., 242 F.3d 759, 762 (7th Cir. 2001)).  Such evidence allows the trier of fact to infer intentional discrimination on the part of the employer.  Id.  Examples of circumstantial evidence include "(1) suspicious timing, ambiguous statements, etc., (2) evidence that similarly situated employees were treated differently, or (3) evidence that the employee was qualified and passed over for the job

and the employer's reason for the difference in treatment is a pretext" for retaliation. Gorence, 242 F.3d at 762.

1. <u>Suspicious Timing, Ambiguous Statements, Etc.</u>

The first type of circumstantial evidence that may be presented includes suspicious timing, ambiguous statements, or the like. Gorence, 242 F.3d at 762. Here, Tyson filed the worker's compensation claim in October, 2004, and Essebo was terminated fourteen months later in December, 2005. Essebo argues she was terminated due to filing her worker's compensation claim.

Tyson argues that this time lag does not support a such a finding. Particularly, Tyson cites Bush v. Commonwealth Edison Co., 990 F.2d 928, 934 (7th Cir. 1993), where the Court explained that it was unlikely the employer would terminate the employee because of filing a worker's compensation claim eighteen months prior to being terminated. Similarly, Tyson cites Hughes v. Derwinski, 967 F.2d 1168, 1174-75 (7th Cir. 1992), where the court found that a four month difference between filing an employment discrimination claim and receiving disciplinary action was too tenuous to create an appearance of pretext. Here, the Court finds that Essebo has not sufficiently demonstrated suspicious timing between her protected activity and her termination.

2. <u>Similarly Situated Employees</u>

The second type of circumstantial evidence that may provide an answer to whether Essebo was terminated due to her exercise of the protected activity, is evidence that similarly situated employees were treated differently. Gorence, 242 F.3d at 762. In the present case, it is undisputed that "between 2003 and 2006, defendant terminated no

less than eleven (11) individuals at the Joslin facility who have exceeded a one year leave of absence pursuant to [its leave policy found in its collective bargaining agreement ("CBA")]." (Def's Motion for Summary Judgment p. 8, submission 41, statement of undisputed material facts)  Additionally, the record does not indicate any employees who exceeded the one-year leave policy and remained employed at Tyson. Therefore, the Court finds that Essebo was not treated differently than other similarly situated individuals terminated between 2003 and 2006.

3.   Pretext for Discrimination

A final type of circumstantial evidence is evidence that the employer's stated reason for the adverse job action was a pretext for retaliation.  Gorence, 242 F.3d at 762. In this case, Essebo sought additional medical opinions after Lund released her from work restrictions.  Burge, Udehn, Goetsch, and physical therapists from Milan Medical Group all saw Essebo.  None of them ever released her to work at any time following her injury.  Essebo admitted, through deposition testimony, that she continues to be unable to work.  Essebo argues she could have maintained her light-duty job in the supply area, and if offered that position, she would never have sought additional medical care; however, the claim now before the court is that of retaliatory discharge; therefore, this argument need not be addressed.

Essebo has failed to establish a claim for retaliatory discharge, as a result of her Illinois Workers' Compensation Claim, under the direct method of proof.

B.   Indirect Method

Under the indirect method, the plaintiff must establish a prima facie case of retaliation. McDonnell Douglas Corp., 411 U.S. at 802. Specifically, the plaintiff must demonstrate "(1) she engaged in statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." Id. In the present case, it is undisputed that elements one and three of the prima facie case are met. Essebo's employer did file a worker's compensation claim for her, thereby engaging in a statutorily protected activity. Additionally, fourteen months later, Essebo suffered an adverse employment action–termination. To establish the prima facie case, all elements must be satisfied. Thus, failure to establish either element two or element four creates a failure to satisfy the indirect method of proving a claim for retaliatory discharge.

It is undisputed that Essebo has not worked, in any capacity, since December 1, 2004. (Def's Motion for Summary Judgment p. 8, submission 40, statement of undisputed material facts). Additionally, Essebo's deposition testimony confirms that she does not believe she is capable of performing any job. As stated before, Tyson hired Essebo to be a Feather Bone Buster. Essebo was not able to perform her job of Feather Bone Buster, which Tyson legitimately expected her to perform. Therefore, the Court finds Essebo fails to demonstrate that she was meeting her employer's legitimate expectations.

Additionally, it is undisputed that "between 2003 and 2006, defendant terminated no less than eleven (11) individuals at the Joslin facility who had exceeded a one year

leave of absence pursuant to the CBA Art. 18, § 19, seven (7) of whom did not suffer a work-related injury." (Def's Motion for Summary Judgment p. 8, submission 41, statement of undisputed material facts). The Court finds that this demonstrates that Essebo was treated like similarly situated employees who did not engage in statutorily protected activity.

Essebo fails to establish all of the elements of the prima facie case, thereby failing to establish a retaliatory discharge claim using the indirect method of proof.

In sum, the Court finds that no reasonable jury could find for Essebo under either method of proof. Accordingly, there is no triable issue of material fact and Tyson should be granted summary judgment as a matter of law.

Additional Argument

Essebo, through her deposition testimony and various responses to Tyson's Motion for Summary Judgement, denies ever receiving correspondence from Tyson. However, this is in direct conflict with Essebo's assertions, also in her deposition testimony and her response to the motion for summary judgment, that all of her correspondence with Tyson regarding her rights under the CBA, her official leave of absence, and her subsequent termination, were written in English, and not communicated to her in either of her native languages. She argues that: she did not know she was on official leave of absence, or even what a leave of absence was; she did not know that she would be terminated within a year of being placed on said leave; and she did not know she had the right to regain her employment, after her termination, through the union process. However, Essebo cites no authority creating a duty in Tyson

to explain this information either in either of her native languages. The Court finds no supporting authority for such an argument.

Moreover, the Court finds it striking that Essebo never asked anybody what this correspondence meant. Essebo's testimony articulated that before employees are hired, Tyson has them attend "training." While at training, Tyson explains "the Union." There are no details as to what exactly was explained to the employees; however, there is no dispute that Essebo went to this training. Additionally, Essebo demonstrates a history of understanding important communications to her. When Essebo needed to communicate with people in Tyson's medical department, she had a co-worker translate for her. When she received work-release forms from her various doctors, she went to the company to drop them off. It seems that at some point, Essebo was under a duty to exercise a good-faith effort to establish what Tyson's correspondence meant, as she made sure to understand other important information that was communicated to her from various sources.

## CONCLUSION

For the foregoing reasons, Tyson's Motion for Summary Judgment [#12] is GRANTED. This matter is now TERMINATED.

ENTERED this 8th day of July, 2009.

                                                s/ Michael M. Mihm
                                                Michael M. Mihm
                                                United States District Judge